## APPEAL OF AUTOMATIC TRANSPORTATION CO.

Docket No. 2676.   Submitted June 18, 1925.   Decided January 30, 1926.

1. Evidence *held* insufficient to establish value of assets acquired in exchange for stock.

2. Where machinery is discarded as the result of changed business conditions, the taxpayer may deduct in such year the difference between the depreciated cost and the salvage value.

*Joseph A. Albrecht, Esq.*, for the taxpayer.
*Lee I. Park, Esq.*, for the Commissioner.

Before GREEN and MORRIS.

The Commissioner, after consideration of protests and claims in abatement, found an overassessment of income and profits taxes for 1917 of $2,114.66, and determined deficiencies in income and profits taxes for 1918 and 1919 of $9,372.61 and $6,711.24, respectively.

Two errors are set out as the basis of the appeal. First, that the Commissioner did not allow, in his computation of invested capital, an item of $1,000,000 set up by reason of an exchange of stock of the

par value of that amount for patents; and, second, that a deduction in the sum of $46,022.91, claimed for the year 1918, was erroneously disallowed for that year and allowed in the subsequent year.

FINDINGS OF FACT.

The taxpayer is a New York corporation, organized in 1921 to take over an Arizona corporation of the same name organized in June of 1906. The original authorized capital stock of the taxpayer was $2,000,000, divided into 40,000 shares of a par value of $50 each.

Prior to June, 1906, William C. Carr had invented certain automatic transportation devices and had made application for letters patent thereon. These transportation devices were systems of automatic freight carriers for use in factories, warehouses, and railway terminals. The inventions covered electrically driven trucks which would operate on the ground or floor or on tracks either on the floor or suspended from the ceiling or roof. The patents when issued were basic. At the time of the organization of the corporation, Carr had perfected 15 inventions, all relating to automatic transportation.

The corporation was organized to acquire these patents and to manufacture and sell the devices controlled thereby. Prior to its organization, Carr interested in the patents the several individuals who subsequently became the incorporators, and they all agreed upon the payment that was to be made to Carr therefor. Shortly after the organization the patents were transferred to the company. In consideration thereof, the company agreed to pay $50,000 in cash, which was subsequently paid, and to deliver to Carr 20,000 shares of its corporate stock, which was done immediately.

Instead of making arrangements with a brokerage house to handle the sale of the remainder of the stock, the officers determined to offer it to the public through their own sales agents. Pursuant to this plan numerous small blocks of stock were placed in the hands of agents at the times and sold for the prices mentioned below:

| Directors' meeting authorizing sale. | Number of shares. | Price. | Directors' meeting authorizing sale. | Number of shares. | Price. |
|---|---|---|---|---|---|
| July 5, 1906 | 1,000 | $12.50 | Apr. 2, 1908 | 3,000 | $30.00 |
| Feb. 20, 1907 | 3,000 | 17.50 | July 2, 1908 | 3,000 | 35.00 |
| Apr. 28, 1907 | 3,000 | 20.00 | Nov. 1, 1908 | 3,000 | 40.00 |
| June 28, 1907 | 3,000 | 22.50 | Apr. 18, 1909 | 3,000 | 45.00 |
| Aug. 28, 1907 | 3,000 | 25.00 | Aug. 14, 1909 | (¹) | 50.00 |
| Nov. 18, 1907 | 3,000 | 27.50 | | | |

¹ All unissued shares.

The first actual sale of stock was made on August 29, 1906. The sales of stock at the price fixed for the first block exceeded the authorized number. Sales at this price were stopped on March 1, 1907, by which time a total of 1,186 shares had been sold. The pur-

chases were in small lots, varying from one or two shares to ten shares each, with an occasional purchase of a larger block. The total sales of stock amounted to 18,869 shares having a par value of $943,450. For these shares the company received the sum of $477,-995.50, or an average price slightly in excess of $25 per share.

The taxpayer experienced great difficulty in convincing the buying public that its products were meritorious, and it was not until 1911 that its first sales were made. There were no profits from the date of organization to the date of these sales. Thereafter, it developed rapidly, until at the present time it does a large and lucrative business.

Before the entrance of the United States into the World War the taxpayer entered into a contract with certain foreign governments to manufacture shells. Prior to April 6, 1917, it expended $62,809.97 in the purchase of machinery necessary for the performance of the contract. After the entrance of this country into the World War, the taxpayer manufactured shells for our Government, and it was necessary to purchase additional machinery to supplement that above referred to.

All work on shells ceased on November 11, 1918. Thereafter the machinery was of no use, none of it being suitable for use in the manufacture of the company's regular products. It was disconnected and removed from the shops with the intention of selling it immediately. Before the books were closed on December 31, 1918, all of such machinery was written down on the company's books to its junk or scrap value, which, in the case of the lot of special machinery first purchased, was $5,528. Upon this machinery depreciation had been claimed and deducted for the years 1915, 1916, and 1917, in the total sum of $11,259.07.

The taxpayer filed a claim for amortization in which was included, by error, the special machinery acquired before April 6, 1917. The claim, to the extent that it related to machinery purchased prior to April 6, 1917, was denied, and the amount is now for the first time claimed as a deduction against income. The machinery was sold in 1919 for $15,000, and the excess of this amount over the alleged junk value was reported as income for 1919.

#### DECISION.

The deficiency should be computed in accordance with the following opinion. Final determination will be settled on 15 days' notice, in accordance with Rule 50.

#### OPINION.

GREEN: We are unable to determine the value of the property received in exchange for the stock. Certain witnesses testified that

the directors believed that the applications and patents, at the time they were acquired, were worth the par value of the stock issued therefor. The prices at which the stock was subsequently placed on the market and sold indicate that there was no firm foundation for such a belief. There were no earnings either previous to the acquisition of the applications and patents or within five years thereafter. The only evidence introduced which tends to prove value was that relating to the sale of the first 1,186 shares of stock at $12.50 per share. These sales were in very small lots. They afford no basis for a determination of the value of the 20,000 shares transferred to Carr. It is possible that such a block of stock, being 50 per cent of the total authorized capital stock, would be worth considerably more per share than shares which were sold in small lots, but it is probable that, if a purchaser could have been found for such a block of stock, it would have been necessary to reduce the price considerably below that asked for the stock in small blocks. We are not unmindful of the difficulties attendant upon proof of value in a case of this kind, but this Board can only determine values from the evidence. Here the relationship between the values of the applications and patents and the price paid for very small blocks of stock is too remote to afford a criterion for the measure of the value of one by the value of the other.

We have heretofore held, in the *Appeal of Dilling Cotton Mills*, 2 B. T. A. 127, that where machinery is discarded as the result of change in business conditions, the taxpayer may deduct in such year the difference between the depreciated cost and the salvage value. The rule there announced is controlling here, and so much of the deficiency as arises from the refusal of the Commissioner to allow such deduction is disapproved.

On reference to the Board:

STERNHAGEN, dissenting: I disagree with so much of the decision as allows the deduction as a loss in 1918 of any part of the cost of the property the use of which was discontinued in that year and which was sold in 1919.

JAMES, LITTLETON, MARQUETTE, and PHILLIPS concur in the dissent.